[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action to dissolve the marriage of the parties on the ground of irretrievable breakdown. Each party was represented by legal counsel. They presented exhibits and testimony from a total of twelve witnesses on November 8 and November 9, 2001, and March 22 and April 10, 2002. Part of the evidence was a full custody/visitation evaluation and report dated September 7, 2001, and testimony from the family relations officer who conducted the study.
The more credible evidence leads to the following factual findings. The plaintiff and the defendant, whose maiden name was Abha Kataria, married June 26, 1989, in India. They have resided in the State of Connecticut continuously for more than one year next before the date of the complaint. There are two minor children issue of the marriage, to wit: Neel Mazumdar, born January 3, 1991, and Akash Mazumdar, born February 10, 1992. No other minor children have been born to the wife since the date of the marriage. Neither the parties nor the children have received financial support during the marriage from the State of Connecticut or any municipality thereof. The marriage of the parties has broken down irretrievably.
The plaintiff husband is a citizen of India. His application for US citizenship is pending. He has an undergraduate degree in chemistry and physics and a post-graduate certificate in marketing management. He worked as a part-time teacher in India. Both his parents are deceased. He has a brother and a sister living in India. After marrying the defendant in India, the plaintiff arrived in the United States November 25, 1989. He was unemployed for five months thereafter.
The plaintiff's first job in the United States paid only a few dollars an hour. He worked at Madrigal Audiographs as an electronics test CT Page 5793 technician for five years beginning in 1990; he worked at Digitech; and he worked at Telepartner International as a programmer through December, 1997. He moonlighted for a few months on weekends as desk clerk at a motor lodge to supplement the family income. He also attended Middlesex Community College at night to secure his post-graduate certificate in marketing management. From 1996 to 1998, the plaintiff worked a second job at night with a partner, John Makara, setting up a computer systems integration business. He derived little net income from the enterprise and discontinued his business association with Makara in 1999.
At the beginning of 1998, the plaintiff was hired as network manager at $53,000 per year at CIDRA Corporation, a start-up research and development company. He was the company's thirty-fifth employee. Through outstanding job performance and extra effort, the plaintiff advanced rapidly to the position of director of information technology at an annual salary of $90,000 by late-1999. When CIDRA was readying an initial public offering early in 2000, the company's future looked limitless. With the collapse of Internet companies beginning in the spring of 2000, CIDRA had to pull back its IPO and retrench. The company has retooled into an operations company and implemented more than 125 layoffs in 2001, from its 396 maximum employment level. Nevertheless, it appears that the plaintiff's job and $90,000 salary are secure for the foreseeable future. As additional compensation, he has received stock options each of the last three years. He is in good health.
The defendant wife was born in India. She arrived in the United States in October, 1982, with her parents, brothers and sisters at the age of 22 or 23. Only one aunt of the defendant continues to live in India. The defendant became a US citizen before her marriage to the plaintiff in 1989. She has a bachelor of science degree in chemistry from the University of Bombay. In 1986, she earned her masters degree in business administration from the University of New Haven.
Before traveling to India in 1988, the defendant worked at Northeast Savings Bank in Connecticut for two years as a programmer/analyst. In 1988, the defendant placed a matrimonial advertisement in a newspaper in India. This is a respected and approved method in India for seeking a marital partner. The plaintiff, who resided in New Delhi at the time, responded to the ad. After courtship the parties married in June, 1989, in India. The defendant returned immediately to the United States and began working at Travelers Insurance. She sponsored the plaintiff to the United States as her spouse. With his green card, the plaintiff arrived in the United States in November, 1989. He had no job and no assets. The defendant had a modest car and miscellaneous apartment furnishings. She owed $7,000 to $10,000 on student loans at the outset of the marriage. The couple settled into the defendant's apartment in Middletown. CT Page 5794
The parties' first son, Neel Mazumdar, was born January 3, 1991. In his first year, Neel lived primarily with his maternal grandparents in Westport, Connecticut. The parties' second son, Akash Mazumdar, was born February 10, 1992. Upon the arrival of the second child, the defendant made arrangements with Travelers to work from home. She went to the Travelers office Thursday mornings only.
When Travelers was taken over by Primerica in 1994, the defendant lost her job. She was not employed outside the home for one and one-half years. When the monies from the Travelers one-year severance package ran out, the defendant sought work in 1995. After six months of looking, she secured employment at The Hartford as an in-house consultant. One year later she was offered a permanent position at $50,000 per year as a programmer/analyst. Early in 1997, she arranged her work at The Hartford into a four-day workweek — two days from home and two days from the office. This allowed her to volunteer at her sons' school on Fridays.
The plaintiff was working long hours at CIDRA beginning in 1998. The defendant cut back her hours at The Hartford starting in the summer of 1999. She then became an hourly worker at $29 per hour. In January, 2000, the defendant left her job at The Hartford.
The defendant began looking for fulltime employment in the fall of 2000. She searched at insurance companies and sought programmer/analyst positions or administrative positions. In September, 2001, she began substitute teaching in the Wallingford school system. She is much in demand and works every school day at a per diem of $60. She has been accepted to an 8-week accelerated teacher certification program in the summer of 2002. With her certification she will be able to secure a fulltime teaching position in the fall of 2002, at a projected salary of $38,000 to $40,000. Teachers of her subjects — math and science — are in short supply. The defendant is in good health.
The two minor children are in the fifth and fourth grades in school. They both do well in school and seem happy and well adjusted in the presence of each parent. Both parents participate with the children in school and extracurricular activities. Both attend the boys' athletic events. The plaintiff has coached his sons' soccer teams since 1997. Although the work schedules of both parents restricted their time with the boys at earlier stages of their lives, the plaintiff's current job at CIDRA and the defendant's prospective job as a teacher will allow each party to devote ample time to the care and nurturing of the minor children. Each party concedes that the other has a good relationship with the children; each party states no safety concerns for the children while they are in the care of the other. The children are in good health. CT Page 5795
At the insistence of the plaintiff, the entire family traveled to India in 1999, to visit with the plaintiff's family and to sightsee. The plaintiff was eager for a return trip in the year 2000. The defendant resisted. The defendant is afraid that the plaintiff wishes to return to live in India soon and that he will take the children with him when he goes. The plaintiff denies any such plan.
The first home purchased by the parties was in Cromwell, Connecticut. They sold that home at a loss and bought a newer home at 7 Merriman Lane, Wallingford, Connecticut (residence) in February, 2000. The $26,000 (10 percent of purchase price) applied to the equity at the time of purchase came from the parties' savings and from a $3,500 loan from the defendant's 401(k). The defendant's parents repaid the 401(k) loan essentially as a gift to the defendant. The plaintiff was forced to move out of the residence August 25, 2000. Today the residence is worth $301,000 with equity of $72,000. However, the defendant has a real estate tax-deferment liability owed to the mortgage lender in the amount of $2,000 to $3,000.
Although the parties agree that joint legal custody is appropriate, they have been battling almost two years over issues of residential custody and visitation. Other disputed issues have been spousal support, property division, debt division, allocation of tax exemptions, and the award of attorney fees.
In 1995, the plaintiff began speaking to the defendant of divorce. The defendant testified that the plaintiff had threatened divorce so many times that she no longer took him seriously. Therefore, she was shocked when the plaintiff made it clear in April, 2000, that he did not want to be married to the defendant any longer. The plaintiff asserts that the defendant was not supportive of the plaintiff's relations with his family in India. He cites her refusal to revisit India in 2000, as an example. He feels that the defendant has been critical of him for failing to get a masters degree. Allegedly she attributes his success in the workplace purely to luck. She has accused him of infidelity and has treated him as if he were outside of the family. She refused to participate in marriage counseling. The defendant says that the plaintiff has been a workaholic and absentee father. She has seen his insistence on return trips to India as a repudiation of his original promise to make his home in the US. She quit a good-paying job in January, 2000, to become a fulltime homemaker in an effort to please her husband and his desire for a traditional Indian wife and cook. The court perceives the fault in the breakdown of the marriage as equally distributed between the parties.
The parties held the following assets and debts at the time of the CT Page 5796 hearing on the dissolution of their marriage:
A. Plaintiff's Assets
1. CIDRA stock options, 15,000 shares vested. Pre-tax net = $16,500
2. CIDRA stock options, ca. 8,000 shares vested as of April 30, 2002. Pre-tax net = $5,000
3. CIDRA stock options, ca. 2,000 shares unvested as of April 30, 2002. Pre-tax net = $1,250
4. CIDRA stock options, 1,875 shares unvested as of April 30, 2002. Pre-tax net = $0. (Option price = $3.00; current fair market value = $1.25)
4. 401(k) from Madrigal Audiograph Labs — $1,466
5. 401(k) from Telepartner Int. — $11,215
6. 401(k) from CIDRA — $17,662 (This is the net after a $5,000 loan.)
7. Southington Savings Bank personal account — $450
B. Defendant's Assets
1. 401(k) from The Hartford — ca. $33,324
2. 401(k) from Travelers — $23,259 (This is the net after a $10,000 withdrawal.)
3. Pension at Citigroup — $9,392 ($265/mon. at age 65)
4. Liberty Bank personal account — $1,100
C. Joint Assets
1. Residence at 7 Merriman Lane, Wallingford, Connecticut — net equity $72,000
2. 1993 Nissan Sentra automobile; 1994 Nissan Sentra automobile. Difference in value is about $600
3. Miscellaneous household furnishings
D. Plaintiff's Debts. About $21,000 of the plaintiff's credit card debt CT Page 5797 is attributable to expenditures benefiting both parties and the children.
1. ATT Universal Card — $11,613
2. MBNA — $16,543
3. Discover — $5,590
4. AMEX — $2,300
B. Defendant's Debts
1. Chase MasterCard — $13,894
2. Discover — $8,650
3. Providian VISA — $11,303
4. Real property tax deferment loan — $2,000 to $3,000
5. Legal fees for this action — $4,790
F. Joint Debts
1. Mortgage on residence at 7 Merriman Lane, Wallingford — $229,000
Despite the size of the debt that each party now carries, neither party has been extravagant in his or her lifestyle. The debt built up from living expenses, house expenses, legal fees, car insurance, home appliances, and the 1999 family trip to India.
The court has considered all the criteria in General Statutes §§46b-56, 46b-62, 46b-81, 46b-82, and 46b-84 in light of the evidence presented by testimony and exhibits. The following are the orders of the court:
1. The marriage of the parties is dissolved and they are each declared to be single and unmarried.
2. The parties shall have joint legal custody of the minor children. Primary residence shall with the defendant.
3. The plaintiff shall have reasonable, liberal and flexible rights of visitation, but at a minimum: CT Page 5798
A. Every Wednesday from 5:00 p.m. to 8:00 p.m.
B. Alternating weekends from at school Friday through Monday morning during the school year. If there is a Monday holiday during the school year, the plaintiff shall be entitled to keep the children with him on his weekend until Monday at 8:00 p.m. This Monday extension does not apply to Monday holidays during the summer, if any. If Good Friday falls on a weekend for the plaintiff and does not fall within a full school vacation week, then the plaintiff shall have the children from after school the Thursday before Good Friday.
C. In the summer of 2002 only, the plaintiff shall have the minor children six (6) consecutive weeks. The six weeks must fall within the eight (8) weeks that the defendant is attending the teacher certification program. The parties shall mutually agree upon the six-week dates on or before June 15, 2002. The defendant shall be entitled to interrupt the six weeks with two weekends Friday 5:00 p.m. to Sunday 8:00 p.m., the two weekends to be selected by her and the selection conveyed to the plaintiff on or before June 20, 2002.
D. Beginning in the summer of 2003, and each summer thereafter, the plaintiff shall have the minor children two (2) consecutive weeks; the defendant shall have the minor children two (2) consecutive weeks. Each party shall give notice to the other of the two weeks that he/she has selected on or before June 15, of each year. In the event that there is a conflict of schedules or a disagreement as to the dates for each party, both as to the summer of 2002, and the summers thereafter, the plaintiff's request shall control in all even years and the defendant's request shall control in all odd years.
E. Special days. Notwithstanding the foregoing schedule, the following schedule shall take precedence over the usual visitation:
i. Thanksgiving Day (9:00 a.m. to 7:00 p.m.) shall be with the party who had the children the weekend immediately prior to Thanksgiving. The weekend visitation or custody for the weekend immediately after Thanksgiving shall commence at 7:00 p.m. on Thanksgiving evening.
ii. The Christmas school holiday shall be divided into two portions. The first portion shall begin at 5:00 p.m. on the last day of school and terminate at noon of the midway point. It shall include both Christmas Eve and Christmas Day. The second portion shall begin at noon on the midway day and extend until the morning that school resumes and shall include New Year's Eve and New Year's Day. The parties shall alternate splitting the two parts with the plaintiff having the first half in all even years and the defendant having the second half. In all odd years the CT Page 5799 defendant shall have the first half and the plaintiff shall have the second half.
iii. The parties shall split all other weeklong school vacations in a similar fashion with the party whose normal weekend rotation occurs at the start of the vacation having the first half and the other party the second half.
iv. The plaintiff shall have the children July 4, 10:00 a.m. to 10:00 p.m. in odd years; the defendant shall have the children July 4, 10:00 a.m. to 10:00 p.m. in even years, including the year 2002.
v. Mother's Day shall always be with the defendant; Father's Day shall always be with the plaintiff.
vi. Each party shall be entitled to spend some quality time with the children on the children's respective birthdays.
4. Until July, 2006, neither party shall cause the minor children to travel outside the United States for any reason without the prior written permission of the other party or further court order.
5. Each party shall have reasonable, liberal and flexible telephone access to the minor children while they are in the care of the other party. Whenever either party travels out of state with the children, he or she shall provide advance notice to the other party and the telephone number where the children can be reached.
6. The plaintiff shall pay to the defendant $319 per week as and for child support in accordance with the child support guidelines. Because it is anticipated that the defendant will secure employment as a teacher in September, 2002, the amount of child support shall be recalculated between the parties in the fall of 2002, based upon the Connecticut child support guidelines and the earned income of the parties at that time. The new amount of child support shall become effective October 18, 2002.
7. Child support shall be payable by direct deposit from the plaintiff's employer to the defendant's bank account if such an arrangement can be made cooperatively with the employer. If such an arrangement is not implemented by the plaintiff's employer, then the plaintiff will make the direct deposit into the defendant's bank account utilizing information supplied to him by the defendant. A contingent wage execution shall issue. There shall be no offset or withholding of child support for any reason. The amount of child support shall not reduce during any visitation time. CT Page 5800
8. As additional child support, the plaintiff shall pay all soccer expenses of the children, including registration fees, uniform and equipment expenses, travel fees to tournaments, and summer camp if the camp specializes in soccer.
9. Each party shall provide to the other a copy of his or her Federal income tax return for the immediate previous tax year, with all schedules and attachments, on or before May 1 each year beginning May 1, 2003.
10. The plaintiff shall maintain the children on his medical, dental and hospitalization insurance coverage as long as that coverage is available to him through his employment. If such coverage is not available to him, the defendant shall provide said coverage if available to her through her employment. If medical and hospitalization coverage is not available to either party through employment, the parties shall share equally the cost of providing such coverage for the benefit of the minor children.
11. Unreimbursed medical, dental, optical, orthodontia, hospitalization, psychological and prescriptive medication costs for the minor children shall be borne equally by the parties.
12. From the date of this order until October 18, 2002, the plaintiff shall pay to the defendant weekly spousal support of $330. It is anticipated that the defendant will commence employment in September, 2002, earning at an annual rate between $35,000 and $40,000. As of October 18, 2002, alimony shall decrease to $150 per week. The alimony obligation shall terminate automatically upon the death of either party, remarriage of the defendant, her cohabitation in a marriage-like relationship, or December 31, 2005, whichever shall occur sooner. Alimony shall be non-modifiable as to term.
13. The plaintiff shall name the defendant as sole beneficiary of his life insurance policy through his employment in the minimal amount of $50,000 so long as his alimony obligation remains.
14. The plaintiff shall name the defendant, as trustee for the children equally, as sole beneficiary of $250,000 of The Hartford life insurance policy so long as his obligation for child support continues for either child. He shall maintain that policy in good standing and shall not hypothecate that policy.
15. The defendant shall name the plaintiff, as trustee for the children equally, as sole beneficiary of $250,000 of The Hartford life insurance policy so long as her obligation for child support continues for either child. She shall maintain that policy in good standing and shall not CT Page 5801 hypothecate that policy.
16. The defendant is awarded sole right, title and interest in and to the marital residence at 7 Merriman Lane, Wallingford, Connecticut. The defendant shall indemnify and save the plaintiff harmless as to all expenses stemming from the ownership and operation of said residence, including but not limited to, the mortgage, taxes, homeowners insurance, maintenance, repairs and utilities. The defendant shall refinance the residence or sell it on or before June 30, 2010, so as to remove the plaintiff from any liability on the mortgage. The defendant shall cause a suitable quitclaim deed to be prepared for execution by the plaintiff and for recording by the defendant.
17. The plaintiff shall retain sole ownership of all the CIDRA stock options, both vested and unvested. He shall retain his personal bank account and all three of his tax-deferred accounts (Madrigal Audiograph Labs, Telepartner Int., and CIDRA). The defendant shall retain no claims or rights as to those tax-deferred plans, whether as survivor, beneficiary or otherwise.
18. The defendant shall retain her personal bank account and all three of her tax-deferred plans (Travelers, The Hartford, and Citigroup). The plaintiff shall retain no claims or rights as to those tax-deferred plans, whether as survivor, beneficiary or otherwise.
19. Each party shall retain one Nissan Sentra automobile and each shall execute the documents necessary to transfer the titles of the cars into one name apiece.
20. The plaintiff shall make a list of those personal property items he wishes to take from the residence at 7 Merriman Lane, Wallingford. He shall remit that list to the defendant on or before May 31, 2002. The plaintiff shall remove all items to which the defendant agrees by June 30, 2002. All other items shall be the sole property of the defendant.
21. The plaintiff shall be solely responsible for all debts appearing on his financial affidavit submitted at the time of the financial dissolution trial. He shall indemnify and save the defendant harmless from those debts.
22. The defendant shall be solely responsible for all debts appearing on her financial affidavit submitted at the time of the financial dissolution trial, with the exception of the 1st USA credit card and the joint Discover credit card (both of which are covered by the plaintiff's affidavit as debts, albeit that they are converted onto other cards.) She shall indemnify and save the plaintiff harmless from those debts. CT Page 5802
23. The plaintiff shall be entitled to claim the tax exemptions for both minor children for the year 2002. Thereafter beginning in the year 2003, the plaintiff shall be entitled to claim the child Akash each year and the defendant shall be entitled to claim the child Neel each year.
24. Neither party is awarded attorney's fee for the prosecution or defense of this matter.
Winslow, J.